# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SEAN D. OLEJNIK**
                **Plaintiff,**

      **v.**                                       **Case No. 21-C-1478**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
                     **Defendant.**

---

## DECISION AND ORDER

Plaintiff Sean Olejnik applied for social security disability benefits, alleging that he could no longer work due to degenerative disc disease of the cervical and lumbar spine, anxiety, and depression. The agency denied his application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") after a hearing. When the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final word from the Commissioner. See Poole v. Kijakazi, 28 F.4th 792, 794 (7th Cir. 2022).

Plaintiff now seeks judicial review of the denial, arguing that the ALJ erred in evaluating several of the medical opinions and the credibility of his statements. For the reasons that follow, while I do not accept all of plaintiff's arguments, I agree the matter must be remanded for further proceedings.

## I. STANDARDS OF REVIEW

### A. Disability Standard

To determine whether a claimant is eligible for disability benefits, an ALJ applies a sequential, five-step test. Prill v. Kijakazi, 23 F.4th 738, 746 (7th Cir. 2022). The ALJ considers

whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity (i.e., "the Listings"); (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other jobs existing in significant numbers in the national economy. Id. at 747.

## B.    Judicial Review

Judicial review of an ALJ's decision is deferential; the court will reverse only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence. Albert v. Kijakazi, 34 F.4th 611, 614 (7th Cir. 2022). The threshold for substantial evidence sufficiency is not high; the ALJ's decision need only identify such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The reviewing court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination. Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022). Rather, the court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions. Id. The ALJ need not address every piece of evidence in the record, but he may not ignore an entire line of evidence contrary to his ruling. Grotts v. Kijakazi, 27 F.4th 1273, 1278 (7th Cir. 2022). He must also explain his analysis of the evidence with enough detail and clarity to permit meaningful review. Scrogham v. Colvin, 765 F.3d 685, 695 (7th Cir. 2014). The court will "remand an ALJ's determination that lacks adequate discussion of the issues." Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009).

2

## II. FACTS AND BACKGROUND

**A.    Plaintiff's Impairments**

The medical evidence reveals that plaintiff underwent cervical fusion surgery in 2010 and again in March 2017 (Tr. at 362, 1730), completing a course of physical therapy after the second procedure with limited benefit (Tr. at 329, 343, 354).  He also received medication for anxiety prescribed by his primary doctor, Patricia Valdes Brost, M.D.  (Tr. at 498-99.)

Plaintiff underwent a functional capacity evaluation ("FCE") in September 2017, which reportedly showed an overall level of sedentary strength and the capability to sustain work for eight hour days/four hour weeks [sic?].[1]  (Tr. at 487, 494.)  During a follow-up visit with Dr. Brost on October 11, 2017, plaintiff reported exacerbation of pain or rebound effect after two hours of sedentary work.  "He even reports still trying to recover after having the functional evaluation as he did not use his neck brace while he was performing the test."  (Tr. at 488.)  Dr. Brost noted: "His major limitations are persistent and intense neck and mid back pain exacerbated by fear and anxiety of reinjury with sudden neck and upper back movements."  (Tr. at 488.)  She concluded: "I really doubt that he will ever regain the capacity to perform sedentary work Full-time as he has undergone multiple surgical procedures, physical therapy and pharmacologic treatment and still remains symptomatic (complaining of shooting pain)."  (Tr. at 488.)

Plaintiff was involved in a motor vehicle accident on October 14, 2017 (Tr. at 317), with cervical x-rays revealing no acute findings and lumbar x-rays showing mild to moderate changes similar to previous studies (Tr. at 324-25).  Plaintiff thereafter spent time in prison for

---

[1]The FCE report is not in the record, just Dr. Brost's description of the results.

drunk driving (Tr. at 391-465), with prison medical records noting some benefit from use of a cervical collar (Tr. at 408, 416) and use of medication to address anxiety and depression (Tr. at 426, 429).

Plaintiff re-established care with Dr. Brost in February 2020 following his release, complaining of chronic neck and back pain, anxiety, depression, and PTSD. (Tr. at 890.) Dr. Brost adjusted his medications and referred him to a pain specialist. (Tr. at 893.) Plaintiff thereafter treated with Dr. Mansoor Aman, who provided a variety of injections, with plaintiff reporting varying levels of relief. (Tr. at 784-89, 537, 796, 535, 1026, 536, 600, 808, 1520.) A February 2020 lumbar MRI revealed multilevel degenerative changes and degenerative disc disease with protrusions at T12-L1 and L5-S1, as well as multilevel moderate to severe central stenosis and multilevel neural foraminal stenosis. (Tr. at 941.) Cervical scans taken at that time revealed unremarkable post-surgical changes. (Tr. at 1040.)

In March 2020, plaintiff began treating with Dr. Stephen Shopbell, a psychiatrist, complaining of neck and back pain, anxiety, and hypervigilance. (Tr. at 582, 583, 586.) On mental status exam, Dr. Shopbell noted unremarkable appearance and hygiene, appropriate and pleasant behavior, and normal speech (Tr. at 587), but anxious mood, dysthymic affect, suspicious thought content with somatic preoccupation, and distractible attention and concentration (Tr. at 588). He diagnosed plaintiff with PTSD, generalized anxiety disorder, and dysthymic disorder, adjusting his medications. (Tr. at 589.) Dr. Shopbell made similar mental status findings (with variable attention/concentration results) during follow-up sessions (Tr. at 592-93, 666-67, 1379-80, 1625-26), adjusting medications to achieve better symptom control and with plaintiff noting some benefit (Tr. at 594-95, 1377, 1623).

In July 2020, Dr. Aman implanted a spinal cord stimulator ("SCS") on a trial basis, with

4

plaintiff reporting decrease in his neck pain and deciding to proceed with a permanent implant. (Tr. at 813-817, 1501.) Dr. Aman implanted the SCS in October 2020. (Tr. at 1549, 1555.)

Seeking better control of his low back pain, in November 2020 plaintiff consulted with Dr. William Bodemer, a surgeon. (Tr. at 1409-10.) On exam, Dr. Bodemer noted limited range of motion but normal upper and lower extremity strength. (Tr. at 1410.) Dr. Bodemer concluded that plaintiff was not a "great surgical candidate" given the nature of his pain, his smoking, and the recent SCS procedure from which he was still healing. (Tr. at 1411.)

Plaintiff continued in pain management treatment, receiving a number of additional injections, with some relief. (Tr. at 1449, 1452, 1439.) He noted no relief from the SCS initially (Tr. at 1614, 1604) but better results after a revision procedure in March 2021 (Tr. at 1659-60, 1661-62, 1728, 1713). He reported ongoing low back and lower extremity pain, seeking another surgical evaluation after he quit smoking. (Tr. at 1731.)

Plaintiff also continued to treat with Dr. Shopbell. (Tr. at 1463-64, 1722-25.) On March 1, 2021, Dr. Shopbell completed a mental impairment questionnaire, finding plaintiff unable to meet competitive standards regarding the ability to maintain regular attendance, complete a normal workday without interruption from psychological symptoms, perform at a consistent pace, and respond appropriately to changes in a routine work setting; and severely limited in the ability to maintain attention for a two hour segment, sustain an ordinary routine without special supervision, work in coordination with others without being distracted, and deal with normal work stress. (Tr. at 1428.) He found no limitations in interacting with the public, maintaining socially appropriate behavior, adhering to basic standards of neatness, travel in unfamiliar places, and use of public transportation. Dr. Shopbell wrote that plaintiff's "chronic pain and depression/anxiety cause unpredictable and inconsistent impairment" and that

5

"chronic pain and depression reinforce each other." (Tr. at 1429.) Under the "paragraph B" criteria of the mental impairment Listings, Dr. Shopbell found moderate limitation in understanding, remembering, or applying information; no or mild limitation in interacting with others; marked limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. (Tr. at 1430.) Finally, he indicated plaintiff would miss more than four days of work per month. (Tr. at 1431.)

## B.    Procedural History

### 1.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in February 2020, alleging a disability onset date of February 23, 2017. (Tr. at 222, 275, 285.) In his disability report, he listed a variety of impairments, including PTSD, cervical disc disorder, anxiety disorder, and lumbar spondylosis. (Tr. at 250.) He reported past employment as a laborer and welder. (Tr. at 252.) In a function report, plaintiff wrote that due his impairments he could not perform simple, easy tasks without severe pain or multiple breaks. His ability to be around other people had also been severely affected. (Tr. at 265.) He further reported that his impairments interfered with personal care (Tr. at 266) and performance of housework (Tr. at 267). He listed hobbies of hunting and fishing but could not do them without help; he did not go anywhere other than medical appointments. (Tr. at 269.) He further indicated that he needed someone to accompany him when he went out and that he felt threatened around groups of people. (Tr. at 269.) He reported that he got along with authority figures but had been fired from a job due to problems getting along with other people. (Tr. at 271.) In a physical activities addendum, plaintiff indicated that he could continuously sit for 10-15 minutes, stand for 10-15 minutes, and walk 10-15 minutes. (Tr. at

6

273.)

On July 3, 2020, the agency denied the application based on the reviews of Mina Khorshidi, M.D., and Jason Kocina, Psy.D. (Tr. at 74, 134.) Dr. Khorshidi found plaintiff capable of sedentary work, with occasional stooping. (Tr. at 83-84.) Under the paragraph B criteria of the mental impairment Listings, Dr. Kocina found no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and mild limitation in adapting or managing oneself. (Tr. at 81.) In his mental RFC report, Dr. Kocina found plaintiff moderately limited in the ability to carry out detailed instructions, explaining that plaintiff "would be able to carry out simple instructions but would have some difficulty carrying out more complex instructions." (Tr. at 85.) Dr. Kocina further endorsed moderate limitation in plaintiff's ability to interact with the general public, stating that plaintiff "would have difficulty interacting with the general public on a frequent basis and would do best in jobs with less frequent public interactions required." (Tr. at 86.)

Plaintiff requested reconsideration, but on October 23, 2020, the agency maintained the denial based on the reviews of Hemantha Surath, M.D., and Therese Harris, Ph.D. (Tr. at 102, 146.) Dr. Surath agreed with the previous restriction to sedentary work but added limitations of occasional climbing of ladders/ropes/scaffolds, frequent balancing, and occasional stooping, kneeling, crouching and crawling. (Tr. at 112-13.) Dr. Harris agreed with Dr. Kocina's assessment of the paragraph B criteria (Tr. at 110) and moderate mental RFC limitations, but added a moderate limitation in responding appropriately to criticism from supervisors (Tr. at 114-15).

### 2.    Hearing

Following the denial at the reconsideration level, plaintiff requested a hearing before an ALJ.  (Tr. at 168.)  On April 8, 2021, he appeared with counsel for a telephonic hearing.  The ALJ also called on a vocational expert ("VE") to provide testimony on jobs plaintiff might be able to do.  (Tr. at 44.)

Plaintiff testified that he was 47 years old, with a high school level education and some technical training, and last worked in February 2017 as a welder.  (Tr. at 50-51.)  He had been incarcerated from October 2017 to February 2020.  (Tr. at 53-54.)

Plaintiff testified that he lived in a house with his girlfriend and their dog.  He indicated that he could shop, using a cart to rest on, but had a hard time being around people.  (Tr. at 54.)  He could cut the lawn but had to take breaks.  (Tr. at 55.)  On a typical day, he got up, watched the news, read the paper, fed the dog, and waited for his next doctor's appointment.  (Tr. at 55-56.)  He did not otherwise go anywhere.  (Tr. at 56.)

Plaintiff testified that he had a stimulator installed, which improved his neck pain, but his "lower back has been pretty trashed."  (Tr. at 56-57.)  A neurosurgeon indicated surgery on his lower back would probably do more harm than good.  (Tr. at 57.)  Plaintiff sometimes wore a neck brace.  (Tr. at 60.)  He also took hydrocodone for pain control.  He sat in a recliner with pillows during the day, and hot showers seemed to help on bad days.  He also had an inversion table, which seemed to help too.  (Tr. at 61.)  As for hobbies, he liked watching the birds.  (Tr. at 61.)  He also liked working on cars but could not do that anymore.  (Tr. at 61-62.)  Asked about sedentary work, plaintiff indicated he could not sit that long due to low back pain.  (Tr. at 62.)  He testified that his ability to be around other people was also not very good.  (Tr. at 64.)

The VE classified plaintiff's past welder jobs as medium to heavy work. (Tr. at 66.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to sedentary work, unable to climb ladders, ropes and scaffolds, with occasional climbing and postural movements, and non-exertional limitations to unskilled work, performing simple, routine and repetitive tasks in a stable work setting, meaning occasional changes and decision-making, with only occasional interaction with the public and coworkers, and limited to work that allows individually performed tasks. (Tr. at 66-67.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs such as document preparer, cutter and paster, and polisher–eyeglass frames. The VE indicated that employers tolerate 10% time off task. (Tr. at 67.)

### 3. ALJ's Decision

On May 14, 2021, the ALJ issued an unfavorable decision. (Tr. at 17.) Following the five-step process, the ALJ determined that plaintiff had not worked at the substantial gainful activity level since February 23, 2017, the alleged onset date. (Tr. at 23.) The ALJ further determined that plaintiff had the severe impairments of degenerative disc disease, anxiety disorder, depression, and PTSD (Tr. at 23), none of which met or equaled a Listing (Tr. at 24-26).

Prior to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, with occasional climbing and postural movements. The ALJ further limited plaintiff to unskilled work, performing simple, routine, repetitive tasks, in a stable work setting, with only occasional interaction with the public and coworkers, and work that allows individually performed tasks. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 27.)

9

The ALJ summarized plaintiff's claims, alleging disability based on physical and mental impairments, with reported difficulty performing tasks due to pain, as well as trouble sleeping, maintaining personal care, preparing meals, doing chores, and shopping in stores. He also reported using a cane and neck brace at times, decreased ability to participate in hobbies, and trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing. He further reported trouble with memory, concentrating, following instructions, getting along with others, handling stress and changes in routine, difficulty in crowds, and being fired due to issues getting along with other people. (Tr. at 27.)

The ALJ found that the record did not supported plaintiff's alleged loss of functioning. Plaintiff had a history of neck and low back pain, and underwent a cervical fusion prior to the onset date, with a second cervical surgery in March 2017, from which he recovered with no complications. Although he continued to report back and neck pain during the remainder of 2017, undergoing physical therapy, examinations generally noted normal musculoskeletal and neurological findings, cervical imaging continued to be unremarkable, and lumbar imaging revealed only mild to moderate degenerative changes. (Tr. at 28.)

Plaintiff continued to complain of neck stiffness and pain with upper extremity numbness in 2018, but neurological findings were normal, and he reported benefit from use of a neck brace. He again complained of pain in early 2019, with an exam noting pain on palpation and fair lumbar range of motion. He again underwent a course of physical therapy, discharging after meeting all goals, and again reported improved sleep with use of a neck brace. (Tr. at 28.)

Plaintiff reestablished care and sought treatment with pain management in early 2020, with a physical exam noting tenderness and painful, limited range of motion. Imaging showed

10

multilevel degenerative changes and stenosis. However, testing of strength, sensation, and motor function was normal. (Tr. at 28.) He received injections but continued to report pain, with providers placing a trial spinal cord stimulator, which eventually provided relief. (Tr. at 28-29.) He received another injection in October 2020 and also had a permanent SCS placed. He continued to report pain, receiving additional injections, and it was noted a revision surgery may be warranted. (Tr. at 29.)

Records from 2021 documented continued pain complaints and some abnormal exam findings, although plaintiff reported some relief with injections and SCS revision. (Tr. at 29.) His most recent physical exam noted intact sensation and normal gait, and he reported improvement with a TENS unit, inversion table, and medication. There was no indication of a surgical recommendation for the lumbar spine. Plaintiff noted improvement to his neck and head pain due to the stimulator, and he also reported hot showers helped his pain. He further noted that he could shop in stores with the use of a cart, do chores with breaks, and go out alone. The ALJ concluded: "Given the objective evidence of record, the undersigned has limited the claimant to sedentary work with no climbing of ladders, ropes or scaffolds and only occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling, but finds no greater physical limitations supported by the evidence of record." (Tr. at 30.)

Plaintiff also reported anxiety during the relevant period, for which he was prescribed medication. He complained of irritability, depressive symptoms, hyperactivity, difficulty with focus, frustration, hypervigilance, and difficulty in crowds. At times, mental status exams noted abnormal mood, affect, thought content, and attention span. However, he had also denied panic, rage, psychosis, agitation, and confusion, and at times denied anxiety and depression. Further, mental status exams were often unremarkable, with normal speech, behavior, mood,

affect, memory, attention, concentration and thought process, and no cognitive impairment. Plaintiff also noted improvement with medication and was observed to be managing adjustment issues and anxiety and coping effectively. Plaintiff reported no mental limitations with respect to maintaining personal care, doing chores, or preparing meals, and he was able to go out alone, shop in stores, handle money, participate in some hobbies, live with others, and care for his dog. The ALJ concluded: "Given the objective evidence of record, the undersigned has further limited the claimant to the performance of unskilled work with simple, routine, and repetitive tasks in a stable work setting with only occasional interaction with the public and coworkers and the ability to perform work with individually-performed tasks, but finds no greater mental limitations supported by the evidence of record." (Tr. at 30.)

As for the medical opinion evidence, the ALJ found somewhat persuasive the report from Dr. Khorshidi, limiting plaintiff to sedentary work with occasional stooping. The ALJ agreed that the medical evidence supported a limitation to sedentary work but found further postural limitations warranted. The ALJ found more persuasive the opinion of Dr. Surath, who limited plaintiff to sedentary work with frequent balancing and occasionally stooping, climbing ladders/ropes/scaffolds and engaging in other postural movements. The ALJ found this opinion more consistent with the record but found that the evidence supported a limitation to only occasional balancing and no climbing of ladders, ropes, or scaffolds. (Tr. at 31.)

The ALJ found unpersuasive Dr. Brost's October 2017 opinion that she doubted plaintiff would regain the capacity to perform sedentary work on a full-time basis, which was apparently based on a functional capacity evaluation noting an ability level of sedentary strength with the capability of sustaining work for eight hour days/four hour weeks. The ALJ noted that the FCE was not in the record, the finding of an eight hour day/four hour week was internally

12

inconsistent, the record did not support and was not consistent with a finding that plaintiff could not ever return to full-time work, and a finding that plaintiff could not perform full-time competitive work was generally reserved to the Commissioner.  (Tr. at 32.)

The ALJ found somewhat persuasive the opinions from Drs. Kocina and Harris that plaintiff could carry out simple instructions but would have difficulty carrying out more complex instructions, would have difficulty interacting with the public on a frequent basis, would do best in jobs with less frequent public interactions, and had moderate limitations in social interaction. The ALJ agreed that plaintiff was limited to unskilled, simple tasks but adopted greater limitations in interacting with others, including a limitation to only occasional interaction with coworkers and the public, and individually performed tasks. (Tr. at 32.) Given plaintiff's anxiety and PTSD, the ALJ also added a limitation to a stable work setting with only occasional changes and decision-making.  (Tr. at 32-33.)

The ALJ found Dr. Shopbell's March 2021 opinion generally inconsistent with and unsupported by the evidence of record.  Although the evidence, including plaintiff's reports of difficulty with memory, following instructions, and focusing, as well as findings (at times) of abnormal thought content and attention span, supported a CPP limitation, the findings of normal memory, concentration, attention, thought process, and thought content, as well as plaintiff's ability to go out alone and handle money, was supportive of and consistent with lesser CPP limitations than those enumerated by Dr. Shopbell.  Further, the findings of generally normal memory with no cognitive impairment supported a finding of no limitation in understanding, remembering, or applying information.  In addition, while plaintiff reported and treated for anxiety and PTSD, with noted hypervigilance and at times abnormal affect and thought content, he had also been noted to have normal affect and thought content and denied

13

hallucinations; these findings supported a lesser limitation in adapting or managing. Finally, the ALJ found that plaintiff's reports of difficulty getting along with others, difficulty in crowds, and abnormal mood and affect at times, supported greater limitations in interacting with others than Dr. Shopbell assessed. (Tr. at 33.)

The ALJ concluded that the evidence simply did not support plaintiff's alleged level of incapacity. Although plaintiff treated for neck and back pain, he reported improvement with injections and placement of a spinal cord stimulator. Further, physical exams had generally been stable, with the most recent exam noting generally intact sensation and normal gait, with imaging stable throughout the relevant period. Plaintiff also complained of symptoms of anxiety, depression, and PTSD during the relevant period. However, he reported improvement with medication; generally denied panic, rage, and ideations; and mental status exams were predominantly unremarkable. Plaintiff was able to shop in stores, do chores with breaks, and go out alone, and he noted no mental limitations with respect to personal care or preparing meals. (Tr. at 34.)

Given this RFC, at step four the ALJ found that plaintiff could not perform his past work, done at the medium and heavy levels. (Tr. at 34.) At step five, however, he found that plaintiff could perform other jobs, as identified by the VE, including document preparer, cutter and paster, and polisher. (Tr. at 35.) The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 36.)

### III. DISCUSSION

A. **Medical Opinions**

For claims filed after March 27, 2017, the ALJ need not defer or give any specific

14

evidentiary weight, including controlling weight, to any medical opinion, including those from the claimant's treating sources. 20 C.F.R. § 404.1520c(a). Rather, the ALJ must determine how persuasive the medical opinions are using a number of factors, including the support offered by the source for the opinion, the consistency of the opinion with the other evidence in the record, the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the claim or an understanding of the disability program's policies and evidentiary requirements. Id. 404.1520c(c). The most important factors are "supportability" and "consistency." Id. 404.1520c(b)(2). Therefore, the ALJ must explain how he considered the supportability and consistency factors; he may, but is not required to, explain how he considered the other factors. Id. § 404.1520c(b).

### 1. Dr. Shopbell

Plaintiff first challenges the ALJ's evaluation of Dr. Shopbell's opinion. (Pl.'s Br. at 8.) While none of the errors plaintiff alleges would, standing alone, necessitate remand, considered together they require the matter be returned for further evaluation.

As set forth more fully above, the ALJ deemed Dr. Shopbell's opinion generally unpersuasive, finding the CPP-related limitations inconsistent with the notations of normal memory, concentration, and attention, as well as plaintiff's ability to go out alone and handle money; the understanding/remembering/applying information limitations inconsistent with the findings of generally normal memory with no cognitive impairment; and the adaptation limitations inconsistent with the findings of normal affect and thought content and no hallucinations.[2] (Tr. at 33.) As discussed below, however, the ALJ did not explain how

---

[2]On the other hand, the ALJ found that the evidence supported greater limitations in social interaction than Dr. Shopbell assessed. (Tr. at 33.) Plaintiff agrees with this finding and

15

plaintiff's activities undermined the doctor's conclusions, he overlooked evidence of cognitive deficits, he did not explain why the unremarkable mental status findings outweighed the evidence of disability cited by Dr. Shopbell, and he failed to evaluate Dr. Shopbell's narrative statements about the combined impact of plaintiff's pain and mental impairments.

### a.    Activities

As plaintiff notes, his ability to go out alone and handle money says nothing about most of the limitations Dr. Shopbell listed, e.g., in his ability to handle work stress, complete a normal workday/week, perform at a consistent pace, and sustain an ordinary routine. (Pl.'s Br. at 8-9; Pl.'s Rep. Br. at 1-2.) The Commissioner responds that elsewhere in his decision the ALJ cited additional activities, e.g., personal care, preparing meals, shopping, performing chores with breaks (Tr. at 27, 30); emphasized that plaintiff's treatment records revealed some improvement with medication (Tr. at 30); and noted that plaintiff had never been psychiatrically hospitalized (Tr. 26), evidence which further undermines Dr. Shopbell's extreme opinion. (Def.'s Br. at 10.)

Plaintiff in reply accuses the Commissioner of violating the Chenery doctrine by citing this evidence. (Pl.'s Rep. Br. at 3, citing Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.").) However, the court reads an ALJ's decision as a whole, and reliance on evidence discussed elsewhere in the decision is permitted. See, e.g., Deloney v. Saul, 840 Fed. Appx. 1, 5 (7th Cir. 2020) (relying on evidence cited "elsewhere in his decision" to uphold ALJ's rejection of a medical opinion); see also Jeske

―――――――――――――――――

does not contest that portion of the ALJ's decision. (Pl.'s Br. at 8.)

v. Saul, 955 F.3d 583, 590 (7th Cir. 2020) ("[W]e are not violating Chenery's command by looking at the ALJ's more thorough discussion of the evidence. Observing that an ALJ placed some of its step-three rationale with its discussion of a claimant's RFC does not give the ALJ's step-three determination new ground to stand upon. It simply identifies the ALJ's step-three rationale for review.").

Plaintiff's stronger argument is that at no point did the ALJ explain how these other activities undermined Dr. Shopbell's suggested limitations. (Pl.'s Rep. Br. at 2-3.) Nor is the discrepancy obvious. See Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) ("[T]he ALJ did not explain why doing these household chores was inconsistent with [plaintiff's] description of her pain and limited mobility. Nor is any inconsistency obvious[.]").[3]

### b. Cognitive Impairment

Plaintiff also challenges the ALJ's reliance on the evidence of "generally normal" memory and lack of cognitive impairment, citing a February 2019 assessment score "which just places him in the range considered to hint at mild cognitive impairment." (Tr. at 457.) The provider, a Dr. Lorentz, wrote that plaintiff's "story and score point to potentially the beginning

---

[3]Absent further explanation, it is also unclear how plaintiff's reported improvement with medication undermined Dr. Shopbell's opinions. See Murphy v. Colvin, 759 F.3d 811, 819 (7th Cir. 2014) ("The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled."). And the fact that plaintiff has never been psychiatrically hospitalized also does not, without further explanation, contradict Dr. Shopbell's report. See Voigt v. Colvin, 781 F.3d 871, 876 (7th Cir. 2015) (explaining that the "institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves," and that the absence of hospitalization does not mean the claimant is "therefore capable of gainful employment"). To be clear, an ALJ is permitted to consider the nature, extent, and effectiveness of the claimant's treatment. The problem in this case was not in the kind of evidence the ALJ cited but in his failure build a bridge from that evidence to his conclusions.

17

of some cognitive declines at what is a pretty young age for that." (Tr. at 457.) While plaintiff concedes that he was often noted to have normal memory, the ALJ failed to discuss this cognitive assessment. Plaintiff further notes that he reported forgetfulness and cognitive deficits on other occasions and included such complaints in his pre-hearing reports, which the ALJ did not reference in evaluating Dr. Shopbell's opinion. (Pl.'s Br. at 10.)

The Commissioner responds that the ALJ need not discuss every piece of evidence in the record, and that Dr. Lorentz's one-time statement that plaintiff's test score "hinted" at mild cognitive impairment does not constitute an entire line of evidence supporting disability, particularly in light of the longitudinal treatment record consistently detailing no cognitive impairment. (Def.'s Br. at 11-12.) In reply, plaintiff argues the Commissioner again violates Chenery by attempting to downplay the significance of this evidence. (Pl.'s Rep. Br. at 5.) As I have previously noted, however, a social security claimant cannot, consistent with the rule that ALJs need not discuss every piece of evidence, accuse an ALJ of skipping medical records, then raise Chenery as a bar to any consideration by the Commissioner or the court of the significance of those records. Thompson v. Saul, 470 F. Supp. 3d 909, 935 n.9 (E.D. Wis. 2020). Moreover, the court need not remand a case for further consideration where it is convinced that the ALJ will reach the same result. McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011).

Had this been the only oversight in the ALJ's assessment, harmless error would likely apply. But because the matter must be remanded for other reasons, the ALJ should consider this evidence on remand.

### c.    Weighing of the Mental Status Findings

Plaintiff next contends that the ALJ failed to explain why the unfavorable evidence was

18

more persuasive in weighing Dr. Shopbell's opinion than the evidence supporting disability. (Pl.'s Br. at 9, citing Moore v. Colvin, 743 F.3d 1118, 1123 (7th Cir. 2014) (remanding where the ALJ did not "explain the rationale for crediting the identified evidence over the contrary evidence").) While the ALJ recited some of the favorable and unfavorable evidence when discussing Dr. Shopbell's opinion, plaintiff asserts that he never articulated why the record rendered the opinion unpersuasive. (Pl.'s Br. at 10, citing Palacios v. Saul, No. 20-C-384, 2021 U.S. Dist. LEXIS 47769, at * 22 (E.D. Wis. Mar. 15, 2021) ("[M]uch of the ALJ's analysis consists of a summary of the evidence, without an explanation as to how the evidence supported his finding.").) Nor, plaintiff contends, did the ALJ grapple with the supporting evidence cited in Dr. Shopbell's report and in his treatment notes, as well as the notes of other sources documenting plaintiff's symptoms. (Pl.'s Br. at 11.)

The Commissioner responds that ALJs are permitted to summarize the evidence, that the ALJ's summary here acknowledged at least some of the contrary evidence, see Gedatus v. Saul, 994 F.3d 893, 901 (7th Cir. 2021) (noting that an ALJ's summary need not mention every detail and affirming where the ALJ noted some of the evidence favorable to the claimant and sided with her to a degree), and that the ALJ satisfied his obligation to minimally articulate his reasoning, see Deloney, 840 Fed. Appx. at 5 (deferring to an ALJ's decision to discount a treating physician's opinion where the ALJ considered the regulatory factors and minimally articulated his reasoning). (Def.'s Br. at 12.)

It is true that an "ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008) (internal quote marks omitted). In this case, however, the ALJ noted a number of disparate findings, some supporting plaintiff's claims and some not, citing exhibits covering

19

hundreds of pages in the record (and without identifying specific pages), then asserted a conclusion that Dr. Shopbell's opinions were unpersuasive.[4]  (Tr. at 33.)  Moreover, the ALJ failed to evaluate the evidence Dr. Shopbell cited in support of his opinion, which finds at least some support in the treatment notes; the Commissioner does not respond to this argument. (See Pl.'s Rep. Br. at 7-8.)

### d.    Narrative Statements

Finally, the ALJ failed to address Dr. Shopbell's narrative statements that plaintiff's "chronic pain and depression reinforce each other" and together "cause unpredictable and inconsistent impairment."  (Pl.'s Br. at 12, citing Tr. at 1429.)  Plaintiff notes that other providers made similar observations regarding the interplay of his pain and anxiety/depression.  (Pl.'s Br. at 12.)  Plaintiff contends that Dr. Shopbell was the only medical source to opine on the combined effects of these impairments, making it all the more critical for the ALJ to address the issue.  (Pl.'s Br. at 13.)

The Commissioner responds that nothing in the regulations or the case-law requires an ALJ to evaluate every sentence in a medical opinion.  (Def.'s Br. at 13, citing 20 C.F.R. § 404.1520c(b)(1) (noting that the agency will articulate how it considered multiple medical opinions from a medical source together in a single analysis and need not articulate how it

---

[4]Later in his decision, the ALJ stated that, while plaintiff displayed abnormal affect, thought content, and attention span at times, his "mental status examinations were predominantly unremarkable."  (Tr. at 34; see also Tr. at 30, stating that "mental status examinations were often unremarkable".)  The Commissioner argues that the ALJ was permitted to give greater weight to the predominantly normal exams than to Dr. Shopbell's extreme medical opinion.  (Def.'s Br. at 12, citing Chambers v. Saul, 861 Fed. Appx. 95 (7th Cir. 2021) ("Notably, Ms. Chambers' mental status examinations during the relevant period . . . were mostly unremarkable with regard to her thought content and processes, cognition, and insight and judgment.").)  As indicated above, I read the ALJ decision as a whole, but I cannot conclude that this statement provides the necessary bridge.

20

considered each medical opinion from one medical source individually); Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995) (noting that an ALJ need not provide a complete written evaluation of every piece of testimony and evidence.)  The Commissioner contends that it was sufficient for the ALJ to find the opinion generally unpersuasive, and he was not required to include additional restrictions to account for Dr. Shopbell's statement that plaintiff's pain and depression reinforce each other.  (Def.'s Br. at 14.)  Finally, the Commissioner argues that the ALJ adequately considered the combined impact of plaintiff's mental and physical impairments, acknowledging his reports of anxiety related to physical concerns, and stating that he considered the entire record and all symptoms in determining RFC.  (Def.'s Br. at 14 n.8.)

Again, while this oversight alone might not support reversal, the ALJ should give specific attention to Dr. Shopbell's narrative statements on remand.  The interplay of plaintiff's pain and his mental impairments appears to be an important part of this case, and the ALJ's boilerplate statement that he considered the entire record does not give confidence that he adequately considered this issue.  See Childress v. Colvin, 845 F.3d 789, 792 (7th Cir. 2017) ("The administrative law judge seems not to have realized that Childress's treating physicians considered all his problems in combination when assessing his ability to stand or sit for long periods of time.  That is the correct approach.").

### 2.    Dr. Brost

Plaintiff also challenges the ALJ's evaluation of Dr. Brost's 2017 statement that she doubted he would regain the capacity to perform sedentary work on a full-time basis.  (Pl.'s Br. at 13.)  As indicated above, the ALJ noted that Dr. Brost relied on a functional capacity evaluation in reaching this conclusion, but the FCE was not in the record; the FCE reportedly concluded that plaintiff could handle an eight hour day/four hour week, making it internally

21

inconsistent; the record did not support and was not consistent with a finding that plaintiff could never return to full-time work; and a finding that plaintiff could not perform full-time competitive work touched on an issue generally reserved to the Commissioner. (Tr. at 32.)

Plaintiff concedes that the FCE is not in the record (Pl.'s Br. at 2 n.1, 13), and that its reported conclusion regarding his daily/weekly capacity for work is confusing (Pl.'s Br. at 13). However, he argues that the ALJ was evaluating the persuasiveness of Dr. Brost's opinion, not the FCE results. (Pl.'s Br. at 13.)

The ALJ was permitted to consider Dr. Brost's reliance on dubious (and missing) evidence in evaluating the strength of her opinion. See 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). Internal inconsistency is also a valid basis for discounting a medical opinion. E.g., Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008).

Plaintiff contends that Dr. Brost also relied on his reports of pain after two hours of sedentary work and that he was still recovering from the FCE. (Pl.'s Br. at 13.) The Commissioner responds that an ALJ need not accept a medical opinion that is based solely on the claimant's subjective statements. (Def.'s Br. at 18, citing Karr v. Saul, 989 F.3d 508, 512 (7th Cir. 2021).) Dr. Brost cited no objective medical evidence in support of her conclusion. See Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) (holding that "medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to [a] citation of a claimant's subjective complaints"); see, e.g., Prill v. Kijakazi, 23 F.4th 738, 751 (7th Cir. 2022) ("As the ALJ found, Dr. Bodeau did not provide objective

22

exams or diagnostic testing to support the limitations he believed were necessary."). Similarly, the ALJ was not required to accept the opinion to the extent it was based on plaintiff's continued reports of pain despite various treatments. (See Pl.'s Br. at 14.)

In reply, plaintiff again alleges a Chenery violation because the ALJ did not discount the opinion as based on subjective statements. (Pl.'s Rep. Br. at 10.) However, the ALJ fully considered plaintiff's subjective statements, including his allegations of pain, in determining that, while he was limited to a reduced range of sedentary work, no greater physical limitations were supported by the record. (Tr. at 30.) It thus seems highly unlikely that the ALJ would have given Dr. Brost's opinion greater weight to the extent is was based on plaintiff's subjective statements.

Plaintiff also challenges the ALJ's reliance on the medical record, citing various pieces of evidence suggesting he could not handle the sitting required of full-time sedentary work. He further suggests that the ALJ improperly relied on his own medical opinion in evaluating this evidence. (Pl.'s Br. at 14-15.)

While the ALJ's discussion of the medical evidence in this section of the decision was cursory, the ALJ also credited the opinions of the agency medical consultants, who reviewed the objective medical evidence and concluded that plaintiff could sustain full-time sedentary work, including sitting for six hours per day. (Tr. at 31, 83, 112). Plaintiff does not challenge the ALJ's reliance on these opinions. See Zoch v. Saul, 981 F.3d 597, 602 (7th Cir. 2020) (affirming ALJ's decision to give an opinion little weight because it conflicted with the objective medical evidence, conflicted with a consulting doctor's report, and relied on the claimant's subjective complaints). In reply, plaintiff notes that the ALJ did not discuss these opinions when assessing Dr. Brost's statement. (Pl.'s Rep. Br. at 10.) But to "require the ALJ to repeat

23

such a discussion throughout his decision would be redundant." Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015); see also Winsted v. Berryhill, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's decision.").

Finally, plaintiff contends the ALJ erred by discounting Dr. Brost's statement because it opined on an issue reserved to the Commissioner. (Pl.'s 15-16.) He cites Seventh Circuit cases holding such statements should not be ignored, e.g., Garcia v. Colvin, 741 F.3d 758, 760 (7th Cir. 2013), but even those cases concede such opinions may be of limited value because the doctor may not be acquainted with the full range of jobs that a person with the claimant's impairments could fill, id. Moreover, the current regulation states that such opinions are "inherently neither valuable nor persuasive" and "we will not provide any analysis about how we considered such evidence." 20 C.F.R. § 404.1520b(c); see Albert, 34 F.4th at 616 ("[T]he ultimate determination of disability is reserved for the Commissioner, and summarily asserting that the claimant is disabled does not suffice under the Commissioner's regulations."). In any event, the ALJ did not dismiss the opinion on this basis alone; he provided a number of reasons for finding it unpersuasive. Plaintiff fails to demonstrate reversible error in the ALJ's evaluation of Dr. Brost's opinion.

### 3. Dr. Harris

Finally, plaintiff contends the ALJ erred in evaluating the opinion of the agency psychological consultant at the reconsideration level, Dr. Harris, who opined that, inter alia, plaintiff had a moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 115.) As indicated above, the ALJ found the opinions from

24

the agency consultants, Drs. Kocina and Harris, somewhat persuasive,[5] agreeing that plaintiff was limited to unskilled, simple tasks but adopting greater limitations in interaction and adaptation.  (Tr. at 32-33.)

Plaintiff faults the ALJ for not including a limitation on interaction with supervisors.  (Pl.'s Br. at 16.)  He cites his function report, in which he related being fired from a job because he did not agree with the procedures of the workplace, wrote that he felt threatened around large groups of people, and described himself as very anti-social.  (Pl.'s Br. at 16-17.)  He also reported symptoms of agitation, irritability, and hypervigilance to his providers.  Plaintiff indicates that, while the ALJ mentioned some of this evidence in his summary of the record, he did not address it when assessing Dr. Harris's opinion.  Nor did the ALJ ask the VE whether a person could perform the identified jobs with reduced interaction with supervisors.  (Pl.'s Br. at 17.)

The problem with this argument is that neither consultant actually endorsed a limitation on interaction with supervisors.  Instead, they explained that plaintiff "would have difficulty interacting with the general public on a frequent basis and would do best in jobs with less frequent public interactions required."[6]  (Tr. at 86, 115, emphasis added.)  Nor did any other medical source endorse such a restriction.  See Gedatus, 994 F.3d at 904 ("A fundamental

_____

[5]Dr. Kocina found plaintiff "not significantly limited" in his ability to accept instructions and respond appropriately to criticism from supervisors.  (Tr. at 85.)

[6]Plaintiff does not in his main brief argue that the attached narrative statement fails to adequately account for the limitations raised in the previous section of the report.  Arguments raised for the first time in reply (see Pl.'s Rep. Br. at 15) are waived.  Carter v. Astrue, 413 Fed. Appx. 899, 906 (7th Cir. 2011).  Nor is it clear what sort of restriction plaintiff believes the ALJ should have included based on the "moderate" limitation in accepting instructions or criticism.  See Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) (stating that it is "unclear what kinds of work restrictions might address [plaintiff's limitations] because he hypothesizes none").

25

problem is [the claimant] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); Rice, 384 F.3d at 370 ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."). Indeed, Dr. Shopbell checked "none-mild" in social interaction (Tr. at 1430) and "limited but satisfactory" in accepting instruction and responding to criticism from supervisors (Tr. at 1428).

Citing some of the same reports plaintiff mentions now (difficulty getting along with others, difficulty in crowds), the ALJ concluded that social interaction limitations were warranted. (Tr. at 25, 30, 33.) He then adopted an RFC limiting plaintiff's exposure to others: only occasional interaction with the public and coworkers, and work allowing individually performed tasks. (Tr. at 27.) The ALJ acknowledged plaintiff's report of a previous termination but further noted that in the same report plaintiff indicated he got along with authority figures. (Tr. at 25, citing Tr. at 271.) The ALJ also acknowledged plaintiff's reports of irritability, frustration, and hypervigilance. (Tr. at 25, 30.) Plaintiff cites additional pieces of evidence in a similar vein (Pl.'s Rep. Br. at 13), but he fails to demonstrate that the record compelled the ALJ to include an additional limitation on interaction with supervisors. See Gedatus, 994 F.3d at 900 ("We will reverse only if the record compels a contrary result.") (internal quote marks omitted).

In reply, plaintiff contends that the ALJ did not explain why he could tolerate unlimited contact with supervisors despite ample evidence that he struggled with social interaction. (Pl.'s Br. at 13.) Nor, plaintiff contends, did the ALJ explain why the social interaction limitations in the RFC accounted for problems dealing with supervisors. (Pl.'s Rep. Br. at 14.) However, it was plaintiff's burden to prove that he had specific limitations, not the ALJ's burden to

26

demonstrate he did not. See Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017); see also Weaver v. Berryhill, 746 Fed. Appx. 574, 579 (7th Cir. 2018) ("It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."). Plaintiff also complains in reply that the ALJ discussed some of the pertinent evidence earlier in his decision, failing to repeat that discussion in evaluating the opinions. (Pl.'s Rep. Br. at 14.) As indicated above, the court reads the ALJ's decision as a whole, and plaintiff cites no authority forbidding consideration of the ALJ's assessment of evidence at earlier steps of the process.

In sum, plaintiff fails to demonstrate reversible error on this basis. Because the matter must be remanded for other reasons, however, plaintiff will be free to suggest additional social interaction limitations on remand.

## B.    Symptom Evaluation

Plaintiff argues that the ALJ also failed to adequately evaluate his pain. (Pl.'s Br. at 17.) In determining whether a claimant is disabled, an ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a).

SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms

27

based on the entire record and considering a variety of factors, including the claimant's daily activities, medications used, and treatment received for relief of the pain or other symptoms. Id. at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently wrong." Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021). The Seventh Circuit has further held that not "all of the ALJ's reasons must be valid as long as enough of them are[.]" Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) (citing Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000)).

The ALJ followed the two-step process here, finding that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the evidence of record. (Tr. at 27.) As indicated above, the ALJ credited plaintiff's claims to a significant degree, accepting that he had severe physical limitations and adopting an RFC for a reduced range of sedentary work. See SSR 96-9p, 1996 SSR LEXIS 6, at *1 ("An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare."). The ALJ also included a number of mental limitations. However, he found that even greater limitations were not supported by the record, citing the objective medical evidence (including stable imaging and exams), plaintiff's reported improvement with treatment, and his activities. (Tr. at 28-30, 34.)

Plaintiff challenges each of these justifications, noting that a person can be stable and

yet disabled, that a person who responds to treatment is not necessarily capable of work, that limited daily activities do not equate to full-time competitive employment, and that lack of objective medical support does not alone permit rejection of pain complaints. (Pl.'s Br. at 17-21, Pl.'s Rep. Br. at 16-17.) It is true that none of the ALJ's observations here <u>necessarily</u> defeated plaintiff's claim. But as Judge Griesbach has explained:

> The ALJ is not required to cite conclusive evidence that a claimant is exaggerating his symptoms or lying in order to find his testimony insufficient to support his claim. Seldom, if ever, is conclusive evidence available in social security disability cases, or any other kind of case for that matter. Not many claimants, for example, describe daily activities that would be impossible to perform if they were truly disabled, and the Social Security Administration does not pay investigators to follow claimants around and see if they are really as functionally limited as they claim. Thus, instead of requiring conclusive evidence that a claimant is not telling the truth, the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not fully credited. The reasons provided by the ALJ must of course be logical, but they need not rule out any possibility that the claimant is truthful. Even in criminal cases where the burden of proof is beyond a reasonable doubt, conclusive evidence is not required to sustain the verdict.

<u>Roovers v. Colvin</u>, No. 14-C-370, 2015 U.S. Dist. LEXIS 8538, at *16-17 (E.D. Wis. Jan. 26, 2015).

Nor, as plaintiff concedes, did the ALJ overlook the evidence that plaintiff continued to experience pain despite various treatments. (Pl.'s Br. at 18.) Plaintiff argues that the ALJ never provided an assessment of how his remaining pain affected his ability to perform sedentary work (Pl.'s Br. at 18), but that is incorrect. The ALJ agreed that plaintiff requires significant limitations but concluded that "the evidence of record simply does not support [plaintiff's] alleged level of incapacity." (Tr. at 34.) The ALJ then explained that given the partial improvement in his pain, plaintiff could sustain the significantly limited range of work set forth in the RFC. (Tr. at 34.)

29

Plaintiff disagrees with this conclusion, but the issue on review is "whether substantial evidence supports the ALJ's ultimate decision—that [plaintiff's] pain is mild enough to enable [him] to work, as millions of other persons with chronic pain do." Kolar v. Berryhill, 695 Fed. Appx. 161, 161 (7th Cir. 2017).

> [Plaintiff's] ability to work depends on just how much chronic pain [he] suffers from. Since pain is subjective and affects people in different ways, it is difficult to determine how much pain is present and how great its effects are. . . . Almost any conclusion an ALJ reaches in such situations may be inconsistent with some evidence in the record and consistent with other evidence. This is where the substantial-evidence standard of review matters.

Id. at 162.

Plaintiff also challenges the ALJ's reliance on "stable" exams, stressing various abnormal findings (Pl.'s Br. at 18-19); "stable" imaging, arguing that his lumbar condition worsened during the relevant period (Pl.'s Br. at 19-20); and the absence of a surgical recommendation for his lumbar spine, noting that the consulting surgeon he saw, Dr. Bodemer, indicated he was not a "great surgical candidate." (Pl.'s Br. at 20, Tr. at 1411.) But the ALJ acknowledged some of the abnormal exam findings (Tr. at 28-29); he discussed the lumbar imaging from 2017 and 2020 (Tr. at 28-29); and he noted that Dr. Bodemer's exam produced no significant cervical, lumbar, upper extremity, or lower extremity findings aside from some reduced range of motion (Tr. at 29, citing Tr. at 1410-11).[7]

The ALJ may have overstated the evidence when he wrote, in the conclusion to the RFC

---

[7]Contrary to plaintiff's suggestion, the ALJ never said that the lack of lumbar surgery undermined plaintiff's reports of pain (Pl.'s Br. at 21, Pl.'s Rep. Br. at 20); he simply noted the absence of a surgical recommendation as part of his discussion of the medical evidence (Tr. at 30). Dr. Bodemer discouraged lumbar surgery for several reasons, including plaintiff's smoking and the recent cervical procedure from which he was still recovering. (Tr. at 1411.) There is evidence that plaintiff sought a further surgical consult after he quit smoking. (Tr. at 1731.)

section of his decision, that "imaging [was] stable throughout the relevant period," without distinguishing between lumbar and cervical imaging. (Tr. at 34.) In the body of the decision, the ALJ more specifically discussed the imaging, correctly noting that the <u>cervical</u> scans were stable but failing to appreciate possible worsening of the lumbar spine:

- Tr. at 28 ¶ 1 – noting that cervical imaging following the March 2017 surgery showed no hardware abnormality, citing Tr. at 355, 357.

- Tr. at 28 ¶ 2 – noting that cervical imaging continued to be unremarkable, even after an October 2017 motor vehicle accident, citing Tr. at 321, and that lumbar imaging showed mild to moderate changes, citing Tr. at 324, a 10/14/17 lumbar x-ray.

- Tr. at 28 ¶ 4 – stating that early 2020 imaging of the lumbar spine showed multilevel degenerative changes and stenosis, citing Tr. at 941. This MRI, from February 2020, found "multilevel moderate to severe central stenosis and multilevel neural foraminal stenosis." This arguably reflects worsening since the March 2017 x-ray.

- Tr. at 28 ¶ 4 – noting that imaging of the cervical spine again noted no remarkable changes, citing Tr. at 1635, a 10/25/20 note citing a 2/20/20 cervical x-ray.

- Tr. at 29 ¶ 1 – discussing treatment in the fall of 2020 and noting that lumbar imaging "again noted multilevel degenerative changes with central stenosis and neural foraminal stenosis", citing Tr. at 1506-07, 1634, which are 9/21/20 and 10/26/20 treatment notes both of which appear to be referencing the same February 2020 MRI.

- Tr. at 29 ¶ 3 – discussing November 2020 treatment and stating that "imaging of the lumbar spine was generally stable", citing Tr. at 1410-11, 1414. Pages 1410-11 are Dr. Bodemer's notes discussing the February 2020 MRI and page 1414 is a new x-ray Dr. Bodemer took at that time revealing: "Diffuse degenerative changes with multilevel disc space narrowing and small anterior-superior congenital changes at L2 and L3."

- Tr. at 29 ¶ 4 – discussing 2021 treatment and stating that "imaging was stable", citing Tr. at 1713, a 3/25/21 note, which appears to reference a 11/24/20 x-ray showing stable cervical hardware.

In arguing that his lumbar condition worsened, plaintiff compares an October 2017 x-ray and

31

a November 2020 MRI. (Pl.'s Rep. Br. at 18-19.) As indicated above, plaintiff had an x-ray in November 2020; it does not appear he had another MRI after February 2020; and it is hard to see much of a difference between the October 2017 and November 2020 x-rays. It is true, however, that the ALJ omitted the words "moderate to severe" in discussing the February 2020 MRI. (Pl.'s Rep. Br. at 19.) Thus, the ALJ's adverse credibility finding was not perfect; but this does not make it "patently wrong." Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).

Plaintiff next challenges the ALJ's reliance on his minimal daily activities. (Pl.'s Br. at 21.) As plaintiff concedes, the ALJ acknowledged his reports of difficulty performing certain tasks due to pain. (Tr. at 27.) Plaintiff criticizes the ALJ for later determining that his reported symptoms were inconsistent with the record, in part due to his activities, and it is true that the ALJ failed to explain how those activities undermined his claims. On the other hand, the ALJ relied on those activities primarily in connection with plaintiff's alleged mental symptoms, not his reported pain. (Tr. at 34, plaintiff "notes no mental limitations with respect to maintaining personal care or preparing meals"; see also Tr. at 33, noting activities in evaluating Dr. Shopbell's report.) There is also no indication that the ALJ made the common mistake of equating daily tasks with full-time work. See Deheck v. Kijakazi, No. 21-C-1191, 2022 U.S. Dist. LEXIS 163492, at *31 (E.D. Wis. July 20, 2022) (noting the critical difference between an ALJ improperly saying, "the claimant can perform this range of activities, therefore he can work," and an ALJ reasonably saying, "the claimant can perform this range of activities, therefore he can do more than he claims"); see also Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) ("[W]e have cautioned ALJs not to equate such activities with the rigorous demands of the workplace. But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was

32

credible or exaggerated.") (internal citations and quote marks omitted).

Finally, plaintiff contends that the ALJ failed to properly assess his extensive treatment history, stressing the improbability that he would undergo all of these procedures unless he suffered from extreme pain. (Pl.'s Br. at 22-23, citing Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004); Pl.'s Rep. Br. at 22.)  But the ALJ reviewed plaintiff's history in some detail, he accepted that plaintiff had significant limitations, and he adopted an RFC for a reduced range of sedentary work.  See Green v. Saul, 781 Fed. Appx. 522, 527 (7th Cir. 2019) (affirming where the ALJ "used what he heard from Green . . . to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified").  This case is unlike Carradine, where the ALJ found that the claimant could, despite extensive pain management treatment, perform a range of light work.  Carradine v. Barnhart, No. 1:02-CV-122, 2002 U.S. Dist. LEXIS 26370, at *4 (N.D. Ind. Oct. 22, 2002), rev'd, 360 F.3d 751 (7th Cir. 2004).  The ALJ in Carradine also failed to appreciate that a claimant could experience debilitating pain without an obvious physical source, id. at 755, a mistake the ALJ did not make in the present case.

In sum, while plaintiff identifies shortcomings, he fails to demonstrate reversible error in the ALJ's assessment of the impact of his pain.  As indicated above, however, the ALJ should on remand consider the interplay of pain and anxiety in reassessing Dr. Shopbell's opinion.  Nothing in this decision precludes the ALJ from giving further consideration to plaintiff's statements in this regard.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision.  The clerk shall enter judgment

accordingly.

Dated at Milwaukee, Wisconsin this 3rd day of November, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge